# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MARY ANNE GRAYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 3924 |
| | ) | |
| MAYOR DWIGHT WELCH, individually and in his | ) | Judge Rebecca R. Pallmeyer |
| official capacity as Mayor and Public Safety Director | ) | |
| of the City of Country Club Hills, HENRIETTA | ) | |
| TURNER, individually and in her official capacity as | ) | |
| City Manager, DEBORAH McILVAIN, individually | ) | |
| and in her official capacity as City Clerk, WILLIAM | ) | |
| A. BROWN, individually and in his (former) capacity | ) | |
| as Police Chief, THERESE O'DONNELL, individually | ) | |
| and in her (former) official capacity as Deputy Police | ) | |
| Chief, GREGORY A. SMITH, individually and in his | ) | |
| former capacity as Sergeant, THE COUNTRY CLUB | ) | |
| HILLS POLICE DEPARTMENT, THE CITY OF | ) | |
| COUNTRY CLUB HILLS, a municipal corporation, | ) | |
| OTHER UNKNOWN CITY OFFICIALS, | ) | |
| EMPLOYEES, AGENTS OR INDEPENDENT | ) | |
| CONTRACTORS THEREOF, MEREDITH PATE, in | ) | |
| her official capacity as an agent of the | ) | |
| Intergovernmental Risk Management Agency, City of | ) | |
| Country Club Hills and its officials and employees. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Anne Grayer had a successful career in law enforcement until she went to work as a police lieutenant for the Village of Country Club Hills. She was terminated from that position in June 2007 and filed this lawsuit two years later, alleging a host of federal and state claims. Proceeding pro se, Grayer has named as Defendants the City of Country Club Hills Police Department; the City of Country Club Hills; Mayor and Public Safety Director Dwight Welch, City Manager Henrietta Turner, City Clerk Deborah McIlvain, former Police Chief William A. Brown, former Deputy Chief Therese O'Donnell, and former Sergeant Gregory A. Smith (all officers of the City of Country Club Hills) in their individual and official capacities; and Meredith Pate and the

Intergovernmental Risk Management Agency ("IRMA"). In her initial complaint, Plaintiff alleged she was harassed by the Country Club Hills Defendants and ultimately terminated from her position as police lieutenant in violation of her First, Fourth, Fifth, and Fourteenth Amendment rights. Against IRMA and attorney Meredith Pate, who were involved in litigation against the Village, Plaintiff leveled a number of claims, including a claim of extortion. Defendants moved to dismiss, and the court granted that motion but gave Plaintiff leave to file an amended complaint. *See Grayer v. Welch*, No. 09 C 3924, 2010 WL 3713689 (N.D. Ill. Sept. 14, 2010).

In her most recent complaint, a third amended complaint filed on December 13, 2010, Plaintiff has again named the Defendants identified above, as well as "other unknown city officials, employees, or agents thereof" and "unknown private business entities, and their employees, agents or independent contractors." (Pl.'s Third Am. Compl. (hereinafter "Compl."), at 1.) In addition to the Constitutional claims she alleged originally, Plaintiff's third amended complaint introduces a number of employment law claims and states additional claims against Pate and IRMA.

Defendants have again moved to dismiss. For the reasons explained here, Defendant Pate and Irma's motions are granted. The remaining Defendants' motion to dismiss is granted in part and denied in part.

## FACTUAL BACKGROUND

The facts alleged in Plaintiff's third amended complaint are deemed true for the purposes of these motions.[1] Plaintiff, a black female, had a twenty-plus year career as a sergeant with the City of Chicago Police Department. (Compl. ¶ 5.) On October 18, 2004, Plaintiff began working for the City of Country Club Hills Police Department as a Police Lieutenant, after being interviewed by the City's Police and Fire Commission. (Compl. ¶ 4.) Plaintiff was initially assigned to the

---

[1] The facts, as presented in Plaintiff's third amended complaint, are quite similar to those presented in the first amended complaint; thus, this court's recitation of the factual background is similar to that presented in this court's initial consideration of the matter.

Communications and Records Division and became Investigations Lieutenant in June 2005. (Compl. ¶ 7.) In her first year on the job, Plaintiff was assigned a number of major projects—which required frequent, unpaid overtime work—and two major internal investigations, including the investigation of a newly promoted detective who also worked as the Mayor's bodyguard. (Compl. ¶ 8.) Plaintiff claims the bodyguard "was subsequently found" (she does not say by whom) "to have falsified substantive information" in two narcotics investigations, and was terminated in August 2005. (Id. ¶ 9.) Plaintiff claims this bodyguard "would later allege" (she does not say when or how) that his supervisor, Sergeant Gregory Smith ("Sgt. Smith"), had directed him to write the false report. (Compl. ¶ 9.)

In early 2006, Plaintiff "began to experience problems" with Sgt. Smith. (Compl. ¶ 10.) The only "problems" she identifies are an allegation that Smith "had exceeded his authority on several occasions and had also been found" (again she does not say when, or by whom) "to have submitted some false or misleading reports." (Compl. ¶ 10.) Plaintiff claims she notified then-Police Chief Brown and Deputy Police Chief O'Donnell about her problems with Sgt. Smith, but they took no action to address the issue. (Id.)

By Spring 2006, Plaintiff alleges, Sergeant Smith began to develop a "close relationship" with Defendant Welch, purportedly helping Welch, a former police sergeant, to "fulfill requirements to carry a weapon and become a conservator of the peace." (Compl. ¶ 11.) Smith also developed a relationship with Defendant Turner and began "doing things without going through the chain of command." (Compl. ¶ 12.) Plaintiff alleges that Smith and other police personnel who had close relationships with Mayor Welch, City Manager Turner, and City Clerk Deborah McIlvain, were treated more favorably than others with respect to "assignments and/or other matters." (Id.)

In August 2006, Defendants Brown and O'Donnell allegedly began to harass Plaintiff; she offers no specifics concerning this harassment other than being excluded from staff meetings and from "business-related social events." (Compl. ¶ 15.) On September 6, 2006, Plaintiff alleges,

when she met with Defendant Smith to tell him about his "inappropriate handling of a criminal case," Smith "went into a tirade," while standing at her office door, blocking access in a threatening and intimidating manner. (Compl. ¶ 16.) Plaintiff had requested that Defendant Brown or Defendant O'Donnell participate in the meeting with Smith, but both had declined. O'Donnell did witness a portion of this "tirade," however, and Brown overheard the interaction—but neither intervened. (Compl. ¶ 17.)

During the Fall of 2006, Plaintiff met with an attorney and also contacted the Equal Employment Opportunity Commission ("EEOC") regarding the harassment she alleges she suffered. On October 27, 2006, just one day after meeting with an attorney whom she later learned was "well known" to Defendants Brown and O'Donnell, Plaintiff was reassigned to a position as Administrative Lieutenant—a position that had no "ongoing supervisory responsibilities." (Compl. ¶¶ 18, 19.)

In March 2007, Plaintiff was summoned to Chief Brown's office and met with Brown and Attorney Russell Hartigan, who had been assigned by the Intergovernmental Risk Management Association ("IRMA")[2] to defend a lawsuit filed by a former police detective, Edward Anderson. (Compl. ¶ 20.) Plaintiff was asked to assist in the discovery process. (Compl. ¶ 20.) Plaintiff alleges that sometime between March 12 and May 6, 2007, she became aware (she does not say how) that Defendants Brown and Smith had made false statements in connection with the Anderson case. Plaintiff brought the matter to the attention of Attorney Hardigan. She also requested and obtained independent counsel through Defendant IRMA, Attorney Laura Scarry (Compl. ¶¶ 21-23.)

On May 24, 2007, Plaintiff learned from other employees of the Department that her

---

[2]     IRMA's website describes the agency as a "municipal risk pool" that provides liability coverage to local municipalities in northeastern Illinois. *IRMA, International Risk Management Agency, Illinois*, http://www.irmarisk.org/Public/About IRMA/WhatIsIrma.asp (last visited Sept. 27, 2011).

termination was imminent. (Compl. ¶ 24.) She proceeded to take elective time off and was away from work beginning on May 25 and returning on May 28. (Compl. ¶¶ 25-26.) The day after her return, on May 29, Plaintiff was summoned to a meeting with Defendants Brown and O'Donnell. Brown confronted Plaintiff "in a very threatening and hostile manner" about her decision to seek legal counsel in the Anderson lawsuit. (Compl. ¶ 26.) Plaintiff told him she had done so because of Brown's own false statements. Brown demanded that Plaintiff prepare a report concerning the matter and then "threw the door open and ordered [Plaintiff] from his office." (Compl. ¶ 26.) The following day, Plaintiff prepared the report and left it with Brown. She also faxed copies to Mayor Welch, to City Manager Turner, and to several attorneys. (Compl. ¶ 27.) Plaintiff gave her deposition in the Anderson lawsuit on May 31. (Compl. ¶¶ 28, 29.) In June 2007, while allegedly dealing with continued workplace harassment, Plaintiff requested a meeting with Defendants Welch and Turner, a request she characterizes as a "complaint to them regarding the inappropriate/illegal conduct of Chief Brown." (Compl. ¶ 29.) Plaintiff asserts that Welch and Turner's "failure to act" in response was a violation of the law. (Id.)

In June 2007, Plaintiff claims she made several attempts to obtain copies of various city ordinances, "specifically those pertaining to the Police Department and Personnel regulations," from the City Clerk, Defendant McIlvain. (Compl. ¶ 30.) McIlvain failed to provide the updated ordinances, so Plaintiff notified Turner and Welch, who also failed to provide these ordinances. (Compl. ¶ 30.) On June 22, 2007, Defendant Brown allegedly reprimanded Plaintiff for having requested ordinances from McIlvain without consulting him first. (Compl. ¶ 31.) Later that day, Plaintiff filed a complaint with the EEOC and the Illinois Attorney General's Office. (Compl. ¶ 32.)

Finally, on June 26, 2007, Plaintiff met with Defendant Welch for what she believed was an interview regarding her eligibility for promotion. (Compl. ¶ 33.) At the meeting, Welch announced that as a result of an ordinance adopted the previous day—which gave Mayor Welch "complete control" over the appointment of police lieutenants—all at-will employee-lieutenants were required

5

to resign.  (Compl. ¶¶ 34-35.)  Welch allegedly announced that, "if Plaintiff did not submit a resignation he was going to 'let her go.' "  (Compl. ¶ 35.)  Plaintiff alleges that, until this amendment was adopted by the City Council on June 25, 2007, police lieutenants had served "at the pleasure of the Police Chief," but were removed only for cause and were entitled to a hearing before the Mayor and City Council on request.  (Compl. ¶ 34.)

On June 28, 2007, Plaintiff informed Defendant Brown that she refused to resign and that she had filed an EEOC complaint.  (Compl. ¶ 37.)  Later that same day, Plaintiff received a letter from Defendant Welch terminating her employment with the Department, effective immediately.  (Compl. ¶ 39.)  Plaintiff, then age 56, was the second oldest employee of the Police Department (Complaint at 22.)  Defendant O'Donnell escorted Plaintiff to her office  to pack up her belongings beginning at 3:30 p.m.  (Compl. ¶ 39.)  At 5:00, O'Donnell directed Plaintiff to return the following day to finish packing , but when she showed up the next morning, Brown "stormed in" to the office, "loudly ordered" her to leave, and announced that he wanted to "'go through it'" and would pack her belongings himself.  (Compl. ¶ 40.)  Brown acknowledged that the computer had been removed from Plaintiff's office and reminded her that it belonged to the department.  (Compl. ¶ 40.)  Plaintiff claims she was not permitted to return to finish packing the belongings in her office until July 2, 2007, and that, when she returned to do so, she found her items were "unsecured."  (Compl. ¶ 41.)

## DISCUSSION

Defendants have moved to dismiss Plaintiff's complaint, pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  In order to survive such a motion, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  In ruling on a 12(b)(6) motion, the court treats all well-pleaded allegations as true, and draws all reasonable inferences in plaintiff's favor. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009).  In considering a 12(b)(6) motion, the issue is adequacy of the complaint, not whether it is meritorious; and thus, while detailed factual allegations

are not required, a plaintiff has an obligation to provide "enough facts to state a claim to relief that is plausible on its face" and that "raise[s] a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009). And it is possible for Plaintiff to "plead herself out of court" by pleading facts that show that he has no legal claim. *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (collecting cases). In "deciding whether the complaint has enough substance to warrant putting the defendant to the expense of discovery," this court must consider whether "some of plaintiff's factual allegations are unrealistic or nonsensical," whether "some contradict others," or whether "some are 'speculative' in the sense of implausible and ungrounded." *Id.*

In her original complaint, filed under 42 U.S.C. § 1983, Plaintiff alleged that Defendants conspired to violate her rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, interfered with her right to free speech under the First Amendment, and violated the Fourth and Fifth Amendments by temporarily denying her access to her office upon her termination. In her third amended complaint, Plaintiff again alleges her Constitutional claims, but also asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA"). In her original complaint, Plaintiff also asserted various state law claims, including charges of extortion against Defendants IRMA, the Village insurer, and Attorney Meredith Pate. In her third amended complaint, Plaintiff reasserts her claim of extortion against these defendants, but adds a charge of conspiracy. The court first reviews the claims Plaintiff presented earlier, and then turns to the claims presented for the first time in the Third Amended Complaint.

I.      **Constitutional Claims**

## A.      Procedural Due Process Claim

Plaintiff claims that she had a "'property interest' in her employment and was unjustly deprived of it" when Defendants failed to provide her with a hearing prior to her termination.  In order to maintain a successful due process claim under § 1983, a plaintiff must demonstrate that (1) she "suffered a deprivation of a cognizable property interest" and that  (2) the "deprivation occurred without due process."  *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  To determine whether an employee has a property interest in continued employment, the court refers to state law.  See *Id.*  Plaintiff bears the burden of establishing a property interest in her job arising out of a state or municipal law or regulation, or a contract that creates such an interest.  *Krieg v. Seybold*, 481 F.3d 512, 519 (7th Cir. 2007) (citing *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 700 (7th Cir. 2001)).

In their original motion to dismiss, Defendants argued that Plaintiff's employment contract and the relevant ordinance governing police lieutenants together created an at-will employment relationship.  As a result, Plaintiff had no protected property interest in her employment with the Police Department entitling her to notice and an opportunity to be heard before her termination. *See Grayer v. Welch*, No. 09 C 3924, 2010 WL 3713689, at *4-5 (N.D. Ill. Sept. 14, 2010).  That decision rested in part on language from the Village ordinance which provides that persons hired for the position of lieutenant from outside the rank and file of Country Clubs Hills officers—such as Plaintiff—have no protected property rights in their positions as lieutenants.[3]  (Country Club Hills Municipal Code § 2.1.02, Ex. A to Mot. to Dismiss the Third Am. Compl. (hereinafter "City's Mot. to Dismiss").); *see Grayer v. Welch*, No. 09 C 3924, 2010 WL 3713689, at *4-5 (N.D. Ill. Sept. 14,

---

[3]      The court may take judicial notice of a municipal ordinance without converting this motion to one for summary judgment.  *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (citing *Venture Assocs. v. Zenith Data Systems*, 987 F.2d 429, 431 (7th Cir. 1993)) (reaffirming that "documents attached to a motion to dismiss are considered part of the pleadings [and may be considered by a district court] if they are referred to in the plaintiff's complaint and are central to his claim").

2010). The court noted, in addition, that in Illinois, employment is presumed to be "at will," and "'it is well settled that, absent legislative, administrative or contractual provisions to the contrary, a public employee in Illinois holds his office at the pleasure of the appointing power, which may remove him at any time.'" *Roth. v. Yingling*, No. 10 C 64, 2010 WL 2732304, at *5 (N.D. Ill. July 8, 2010) (quoting *Harris v. Eckersall*, 331 Ill. App. 3d 930, 775, 771 N.E.2d 1072, 1075 (1st Dist. 2002)). And, finally, this court noted that the one-paragraph document Plaintiff signed at the time of her hire states: "Employment with the City of Country Club Hills is 'at-will,' meaning that either City or its employees may terminate the employment relationship at any time, with or without cause, and with or without notice."[4]  (Employment At-Will Agreement, Ex. B. to City's Mot. to Dismiss.)

In support of her third amended complaint, Plaintiff cites sections 65 ILCS 5/10-2.1-4 (2004) and 65 ILCS 5/10-2.1-17 (2004) of the Illinois Compiled Statutes ("ILCS"). (Pl.'s Resp. to Country Club Hills Mot. to Dismiss Third Am. Compl. (hereinafter "Pl.'s Resp. to City's Mot."), at 15-18.) These sections pertain to the Board of Fire and Police Commissioners, and Plaintiff believes they are relevant to the consideration of whether her employment was "at will." (*Id.*) According to Plaintiff, these sections establish that, as a full-time member of the police department of a municipality, she could be terminated only "for cause" and, under state law, is entitled to a hearing before dismissal.[5]

---

[4]      This agreement further noted, "Your status as an 'at-will' employee may not be changed except in writing signed by the City Manager. Employment at-will is the sole and entire agreement between the City and you concerning the duration of your employment and the circumstances under which your employment may be terminated." (Employment Contract, Ex. B. to City's Motion to Dismiss.)

[5]      The portions quoted by Plaintiff read as follows: '[a]ny full time member of a regular fire or police department of any municipality which comes under the provisions of this Division or adopts this Division 2.1 or which has adopted any of the prior Acts pertaining to fire and police commissioners, is a city officer" and "except as hereinafter provided, no officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense." 65 ILCS 5/10-2.1-4 (2004); 65 ILCS 5/10-2.1-17 (2004).

(*Id.*)  In Plaintiff's view, these state law provisions call into question the "constitutionality and/or legitimacy" of Country Club Hills Municipal Code § 2.1.02.  (*Id.* at 18.)

In response, Defendants point out that the relevant statute, 65 ILCS 5/10-2.1-4, allows a municipality to exempt certain offices from the jurisdiction of the Police Commission.  (City's Reply on Mot. to Dismiss the Third Am. Compl. at 2.)  The relevant language is as follows:  "The board of police and fire commissioners shall appoint all officers and members of the . . . police department, including chief of police . . . unless the council or board of trustees shall by ordinance as to them otherwise provide."  65 ILCS 5/10-2.1-4 (2004).  In this case, Defendants urge, the ordinance does "otherwise provide"; specifically, the language from the Country Club Hills Municipal Code, cited earlier, explains that "[e]ach . . . appointment [of a lieutenant] shall be exempt from the jurisdiction of the Police Commission."[6]  (Country Club Hills Municipal Code § 2.1.02(f), Ex. A to City's Mot. to Dismiss.)  Such an exemption was sanctioned by the Illinois Supreme Court in *Stryker v. Village of Oak Park*, 62 Ill. 2d 523, 527, 343 N.E.2d 919, 922 (1976).  In that case, interpreting the Illinois Constitution of 1970, Ill CONST. art. VII, § 6(a), the Court concluded that a home-rule unit may alter the operation of its board of fire and police commissioners via an ordinance allowing the village manager to terminate the chief of police and the deputy chief, even where such an ordinance conflicted with section 10-2.1-4 and 10-2.1-17 of the ILCS.

This court agrees with Defendants.  A case not cited by either party, Illinois Fraternal Order of Police Labor Council v. Town of Cicero, sums up the issue nicely:  "Under the Illinois Constitution (article VII, section 6(a)), [a home rule municipality] has the power to pass laws that conflict with the directives set out in the Municipal Code concerning the Board of Police and Fire Commissioners.  301 Ill.App. 3d 323, 331, 703 N.E. 2d 559 (1998).  This court concludes that the

---

[6]     The amended version of this ordinance, approved on June 25, 2007 is the same, save for switching "Police Commission" to "Police and Fire Commission."  (Country Club Hills Municipal Code § 2.1.02(c), Ex. A to City's Mot. to Dismiss.)

statutory provisions Plaintiff cites, 65 ILCS 5/10-2.1-4 (2004) and 65 ILCS 5/10-2.1-17 (2004) do not apply here, as lieutenants were legally exempted by the relevant municipality ordinances that were in effect at the time of her hiring, as well as her dismissal.[7]  Plaintiff also now suggests that, because the Board of Fire and Police Commissioners had some involvement in her hire—including involvement in interview and swearing-in process and the granting of a certificate[8]— they somehow waived the provisions of Country Club Hills Municipal Code § 2.1.02.  (Pl.'s Resp. to City's Mot. at 17.)  She offers no authority for such an argument, however, and the court is aware of none.

Finally, Plaintiff alleges a number of new facts regarding the at-will provisions in her contract: she notes that she was never notified of the at-will policy during her conversations regarding the details of her position; that the policy is not mentioned in any personnel ordinances; and that a document she signed confirming this policy was "casual[ly]" inserted into a thick packets of documents to sign, and presented to Plaintiff by the payroll clerk after Plaintiff had worked her first few hours on the job.  Pl.'s Resp. to City's Mot., page 15-17. Assuming these allegations are true, the court concludes they are insufficient to defeat the conclusion that Plaintiff's employment as lieutenant was "at will."  Her procedural due process claim is dismissed with prejudice.

---

[7]     It is also worth noting that, had Country Club Hills *not* been able to exempt its lieutenants, Plaintiff would not have been able to hired as a lieutenant in the first place, as the Act provides that "[a]ll appointments to each department other than that of the lowest rank . . . shall be from the rank next below that to which the appointment is made except as otherwise provided in this section [concerning police chief and deputy chief.]"  65 ILCS 5/10-2.1-4.

[8]     This certificate notes that Plaintiff holds the rank of Police Patrol Lieutenant and prominently state that it was granted by the Board of Fire and Police Commissioners and that the appointment is made pursuant to the provisions of 65-5/10-2.1 (Unmarked Ex. to Pl.'s Resp. to City's Mot..)

## B.    Fourth and Fifth Amendment Claims

Plaintiff argues that her Fourth and Fifth Amendment rights were violated when she was denied access to her office from June 28, 2007 to July 2, 2007.  (Compl. ¶¶ 40-41.)  The Fourth Amendment does not require a public employer to obtain a warrant before conducting a search of an employee's office, *United States v. Fernandes*, 272 F.3d 938, 942 (7th Cir. 2001), though "government employers [are] subject to a reasonableness standard when they conduct . . . workplace searches." *Schaill by Kross v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1314 (7th Cir. 1988), citing *O'Connor v. Ortega*, 480 U.S. 709, 724 (1987).

In considering this issue earlier, the court concluded that a one-weekend delay in allowing Plaintiff to return to the Police Department to obtain her personal property does not violate the Constitution.  *Grayer v. Welch,* No. 09 C 3924, 2010 WL 3713689 at *6 (N.D. Ill. Sept. 14, 2010).  The court noted that "Plaintiff has not explained why the brief delay in allowing entry to her office over the weekend (and without any accompanying search) was unreasonable." *Id.*

Plaintiff's third amended complaint unsuccessfully attempts to cure these problems.  First, she details a number of frustrations that occurred as a result of waiting four days to clean out her office; nothing here, however, strikes the court as unreasonable.  Additionally, Plaintiff adds two sentences alleging a potential search of the materials in the office: "Plaintiff believes that Brown and/or others did in fact search Plaintiff's property.  Brown, in particular, is a demonstrated prevaricator based upon his previous false statements in court filings, etc."  (Compl. ¶ 41.) Plaintiff's belief concerning Brown's character is far too speculative a basis to support the conclusion that a search was conducted, particularly where she has not alleged that any of her product was taken or destroyed.  Finally, Plaintiff now alleges that, following her dismissal, her computer was "subjected to forensic analysis."  (Pl.'s Resp. to City's Mot. at 22.)  But she has not challenged Brown's statement that the computer belonged to the Department, not to Plaintiff personally, nor has she suggested that any of her personal files or private information were

12

removed or tamped with in any way.  Plaintiff's Fourth and Fifth Amendment claims are dismissed with prejudice.

###    C.    Free Speech Claims

Plaintiff's First Amendment claim rests on her assertion that Defendant McIlvain failed to provide her with copies of ordinances relating to the Police Department, and Defendant Brown later reprimanded her for having requested them.  (Compl. ¶¶ 30-31.)  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  In dismissing this claim earlier, the court cautioned that to state such a claim, Plaintiff would be required to (1) address Defendants' concern that Plaintiff made the request pursuant to her official duties, and (2) address Defendants' argument that, to the extent that Plaintiff's free speech claim rests on Brown's June 22 reprimand, it is time barred.  *Grayer v. Welch,* No. 09 C 3924, 2010 WL 3713689 *5 (N.D. Ill. Sept. 14, 2010).

Plaintiff's third amended complaint attempts to address the former concern, noting that, "although [Plaintiff] had made numerous requests for ordinances . . . in her official capacity and duties, the request made the week of June 20, 2007 was also being made because of Plaintiff's personal concern and interest in her job status." (Compl. at ¶ 31.)  In an apparent effort to establish that her speech related to matter of public concern, Plaintiff also now lists a number of "public issues [that] arise" as a result of the passage of the new ordinance.[9]  (Pl.'s Resp. to City's Mot. at 20.)  The additional information does not alter the court's conclusion.  Indeed, the fact that Plaintiff's requests were made from "personal concern" affords an additional defense; "Speech that serves

---

[9]    These "key public issues" include: (1) the expansion of Mayoral powers on account of Welch assuming the new title of "Public Safety Director," (2) the expansion of Mayoral powers on account of Welch having the sole authority to appoint and remove police lieutenants, and (3) the additional expenditure of tax money for two additional employment slots. (Pl.'s Response to County Club Hills' Motion to Dismiss Third Amended Complaint at 20.)

a private or personal interest, as opposed to a community one, does not satisfy the standards for First Amendment protection." *Spiegla v. Hull*, 371 F.3d 928, 936 (7th Cir. 2004). In fact, however, Plaintiff wrote in a memorandum to McIlvain that she was "making the request [for the ordinances] as a City employee and member of the police command staff" because she was "assigned to update and write policy for the Department." (Letter from Grayer to McIlvain of 6/20/07, Ex. D to City's Mot. to Dismiss.)

In any event, even if Plaintiff's allegations were sufficient to state a claim for a free speech violation, that claim would have to be dismissed. Claims under § 1983 are governed by a two-year statute of limitations in Illinois. *Jenkins v. Vill. of Maywood*, 506 F.3d 622, 623 (7th Cir. 2007). Brown's alleged reprimand occurred on June 22, 2007, but Plaintiff did not sue until June 29, 2009—one week too late. Plaintiff contends that the "[free speech] claim does *partly* rest upon Brown's June 22, 2007 reprimand, [but] it should not be time-barred because his action part of the ongoing pattern of harassment and unfair treatment relating to various EEOC issues." (Pl.'s Resp. to City's Mot. at 20 (emphasis added).) As the court reads her allegations, however, Plaintiff's free speech claim is based *entirely* on the June 22 reprimand. Because the alleged improper reprimand is a discrete discriminatory act, Plaintiff's attempt to attach it to the alleged "ongoing pattern of harassment," and thus toll the statute of limitations, fails. Plaintiff's free speech claim is time-barred.

## II.     Claims Against Defendant Pate and IRMA

As noted, Plaintiff has sued IRMA, the Village's insurer, and Attorney Meredith Pate. In its earlier ruling, the court dismissed Plaintiff's claims of extortion against these Defendants. The court noted that the release agreement on which those claims appear to rest are standard practice in resolving disputes, including disputes over wages, and that Illinois presumes the validity of releases unless the agreement is the "product of fraud, duress, mutual mistake, or unconscionability." *Gavery v. Altheimer & Gray*, No. 95 C 2747, 1996 WL 521400, at *3 (N.D. Ill. Sept. 11, 1996).

Plaintiff's third amended complaint does not remedy any of these problems, and her extortion claim must be dismissed.

Plaintiff now attempts to raise a number of new claims against both Pate and IRMA. While these claims vary in their comprehensibility, they appear to add up to an allegation that these parties were involved in a broad conspiracy against Plaintiff that has lasted through the filing of the Plaintiff's complaint. (Compl. at 20-21; Pl.'s Resp to IRMA's Mot. to Dismiss Third Compl. (hereinafter "Pl.'s Resp. To IRMA's Mot."); Pl.'s Resp. to Pate's Mot. to Dismiss Third Compl. (hereinafter "Pl.'s Resp. to Pate's Mot."). This alleged conspiracy primarily involves the assistance that IRMA provided, via their attorneys, to the City of Country Club Hills. (Pl.'s Resp to IRMA's Mot.) Plaintiff appears to believe that Pate was part of this conspiracy (which purportedly included all Country Club Hills Defendants, as well, *see* Pl.'s Resp. To Pate's Mot. ¶ 6), because, after she was retained by Country Club Hills, Pate allegedly denied Plaintiff's request for her personnel file, and also contributed in various ways to wrongdoing on the part of Country Club Hills. (Pl.'s Resp to IRMA's Mot. ¶¶ 3-7.)

This court first notes that these conspiracy claims are primarily fleshed out in Plaintiff's responses to each party's motion to dismiss. IRMA and Pate have expressed understandable frustration at the number of opportunities Ms. Grayer has had to amend, or otherwise fortify, her complaint, and Pate objects to Plaintiff's attempts to further amend her third amended complaint via her response to a motion to dismiss. *See Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss . . . ."). The court is sympathetic to these concerns but, in light of Plaintiff's *pro se* status, has carefully considered all of her allegations, regardless where they appear. The court nevertheless is unable to construe those allegations as stating a valid conspiracy claim. The Seventh Circuit has observed that even before *Twombly* and *Iqbal*, "a bare allegation of conspiracy was not enough to survive a motion to dismiss for failure to state a claim" and "mere suspicion that

persons adverse to the plaintiff had joined a conspiracy against him or her was not enough [to survive a motion to dismiss]."  *Cooney v. Rossiter,* 583 F.3d 967, 970-71 (7th Cir. 2009).  Plaintiff's conspiracy claims against IRMA and Pate must be dismissed.

Next, Plaintiff alleges that IRMA, an insurance risk pool, engaged in a conflict of interest by appointing an attorney to defend the City in Plaintiff's post-termination EEOC litigation, despite having previously appointed a different attorney to represent the Plaintiff in an unrelated legal matter.  (Compl. at 20-21.)  Whatever the merits of this conflict of interest concern, it would not render IRMA liable under §1983.  *See Hutcherson v. Smith*, 908 F.2d 243 (7th Cir. 1990) (finding that even if a city attorney committed legal malpractice under state law in representing both a fire department recruit and members of police and fire merit commission in a state law civil suit brought against them, such conduct does not rise to the level of creating a violation of the recruit's due process rights so as to render attorney liable under §1983).  Plaintiff has not identified a right of action under state law to challenge this alleged conflict, either.

Finally, Plaintiff alleges that Pate improperly denied her access to her personnel files following her discharge in June 2007.  (Compl. at 20.)  In responding to this claim, Pate generously speculates that Plaintiff is attempting to assert a claim under the Illinois Personnel Records Review Act.  (Pate's Rep. in Supp. of her Mot. to Dismiss the Third Am. Compl. at 4.)  If so, these records fall clearly into the exception that the Act provides for records that are relevant to any other pending claim between the employer and employee which may be discovered in a judicial proceeding.  820 ILCS 40/10(f).

For these reasons, all of Plaintiffs claims against Pate and IRMA are dismissed with prejudice.

## III.    Title VII, ADA, and ADEA Claims

Plaintiff's third amended complaint, unlike her first, includes a number of employment claims arising under Title VII of the Civil Rights Act of 1964.  The Seventh Circuit has held that a plaintiff can allege employment discrimination quite generally, even in cases that post-date the Supreme Court's refinement of the standards of notice pleading.  *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) ("[A] complaint alleging sex discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex.").

Plaintiff's third amended complaint presents her Title VII claims in a series of eight different "counts." (Compl. at 22-28.)  Many of these "counts," however, appear to be lists of facts that are not tied to any particular claim.  As best the court understands her allegations, Plaintiff has presented four potential Title VII claims: (1) harassment/hostile work environment, (2) disparate treatment, (3) retaliatory discharge, and (4) post-employment retaliation.  (Compl. at 22–29.) *See Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (explaining that the complaint need not identify the correct legal theory).  Each of these categories will be considered in turn.[10]

### A.    Harassment/Hostile Work Environment Claims (Counts I, II, III, IV, VI, VII, VIII)

A hostile work environment is one in which the harassment is sufficiently "severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005).  To establish such a claim, Plaintiff must show that her working environment is both subjectively and objectively offensive. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).  Circumstances the court may consider in determining whether the work environment is hostile "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

---

[10]    Plaintiff has voluntarily withdrawn her employment claims that relate to the Defendants in their individual capacities.  (Pl.'s Resp. to City's Mot. at 23.)

whether it unreasonably interferes with an employee's work performance." *Harris. v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

In detailing events that could support this claim, Plaintiff identifies a number of incidents in which she was made to feel uncomfortable. (Compl. at 23-26.) The following examples are representative: "[Chief] Brown would become angered if Plaintiff would not immediately comply with directives which she believed to be either unethical or illegal," "[Sargent] Smith frequently went to [either Chief Brown or Deputy Chief O'Donnell] . . . and made false and/or contrived statements about Plaintiff. Rather than . . . ask Plaintiff's account of the incident, they would accept his (usually false) account and call [Plaintiff] into the office for an admonishment without even revealing what he had specifically said." (Compl. at 23.)

Even if all of the conduct alleged by Plaintiff was tied to membership in a protected class—which, from the complaint, is not entirely clear[11]—it falls far short of the "severe or pervasive" level required for the court to find a hostile work environment. *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). These and other alleged incidents may well have been unpleasant for Plaintiff, but Title VII "does not set forth a general civility code for the American workplace." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). Although Plaintiff does offer the conclusory allegation that Smith was "physically" threatening on one occasion, the magnitude and frequently of the alleged incidents, over the two-plus year course of her employment, do not reach the necessary level for such a finding. The court concludes that in providing substantial detail, Plaintiff has effectively "pleaded herself out of court" on this claim.

### B. Plaintiff's Disparate Treatment Claims (I, III, IV, and V)

---

[11] Plaintiff ties only a handful of the alleged incidents to her membership in a protected class, but as these "counts" are presented in this particular section of the third amended complaint, the court assumes that she is alleging these incidents were somehow tied to either her race or sex.

Counts I, III, IV, and V may be read to support a claim of disparate treatment. (Compl. at 23, 25.) For each of these counts, as a preliminary matter, this court must also determine whether a charge was filed with the EEOC challenging the alleged practices within 300 days of their occurrence. 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1) (ADEA). Plaintiff alleges that she filed her charge on June 22, 2007. (Compl. ¶ 10). That would mean that the discrete acts of discrimination must have occurred, or the alleged practice must have been in place, on or after August 26, 2006, but before June 22, 2007.[12]

To establish a *prima facie* case of employment discrimination, Plaintiff must show that she was subject to an "adverse employment action," which includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly dismissed material responsibilities, or other indices that might be unique to a particular situation." *De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685-86 (7th Cir. 2008). Count I alleges, first that Plaintiff's reassignment on October 27, 2006, to a non-supervisory Administrative Lieutenant position was based on sex and race. (Compl. at 7, 23.) Count III alleges that she was subject to different terms and conditions than other, similarly-situated employees, including excessive work assignments; denial of the right to discipline her subordinates; and direction to perform unethical or illegal acts. To the extent that these episodes occurred on or after August 26, 2006, and if Plaintiff can establish that similarly situated persons outside the protected classes (i.e., African-American, female, and over the age of 406) were treated more favorably, they may support her claims of race or sex discrimination. Therefore, Defendants' motion to dismiss Plaintiff's disparate treatment claims are denied.[13]

---

[12] Defendants appear to miscalculate this number, determining that only actions occurring on or after April 2, 2006 can be the subject of the suit. (City's Mot. to Dismiss Pl.'s Compl. at 13)

[13] The court notes, however, that Plaintiff's termination cannot serve as the basis for
(continued...)

## C.     Retaliatory Discharge (Count VII)

Similarly, the court reads Plaintiff's Court VII to support a retaliatory discharge claim under Title VII.  To establish a claim of retaliation under Title VII, Plaintiff must establish that she "suffered a materially adverse employment action" after filling her EEOC claim.  *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728 (7th Cir. 2009).  "Materially adverse employment action" is defined broadly to encompass actions "that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* at 729 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  In Count VII, Plaintiff alleges that she was terminated on June 28, 2007 in retaliation for having "contacted and filed complaints with several law enforcement and/or governmental entitles regarding incidents occurring in the City in general and the Police Department in particular." (Compl. at 26.)  Because the EEOC is one of the "governmental entities" that Plaintiff contacted, on June 22, 2007, Plaintiff has stated a claim for Title VII retaliation.[14]

## D.     Post-employment Retaliation Claim (Count VIII)

Other than her employment termination, Plaintiff lists a variety of ways in which she believes she has been subjected to post-employment retaliation in Count VIII of her third amended complaint.  She alleges that she was denied access to the personal property in her office for five

---

[13](...continued)
a discrimination claim under either Title VII or ADEA because the EEOC charge was filed on June 22, 2007, six days before her termination.

[14]        Plaintiff also alleges that Defendants terminated her in retaliation for having exposed Brown's perjury.  (Compl. at 26, 27.)  To the extent Plaintiff suggests Defendants took action against her because she spoke out about Brown's and Smith's false testimony, such a claim might be understood as a common law claim of retaliatory discharge.  *See Blount v. Stroud*, 232 Ill. 2d 302, 314, 904 N.E.2d 1, 9 (2009).  Assuming such a claim can be asserted against a public employer in Illinois, the court need not address it because any such claim would be time-barred. *See* 745 ILCS 10/8 ("No civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued); *Klinkner v. Cnty. of Du Page*, 331 Ill. App. 3d 48, 52, 770 N.E.2d 734, 737 (2d Dist. 2002) (applying this statute of limitations to a retaliatory discharge claim brought against an public employer).

days after her discharge.  She claims she was denied four vacation days, which were ultimately restored to her in 2010.  She alleges that the was not provided with her personnel file or with any explanation for the termination decision.  She alleges she has been the victim of "ongoing surveillance" by "private entities and or individuals as well as law enforcement officers, employees from Chicago and/or other jurisdictions."  (Compl. at 27).  She notes "several acts of perjury," including false statements allegedly made by Defendants to the Illinois Law Enforcement Training and Standards Board, the Illinois Department of Labor, and the EEOC.  (*Id.*)  She believes Defendants "are party to some of the false drug allegations" made against her (she does not say where or to whom such allegations were made), based upon having "overheard a certain phone conversation Brown had with an unknown party" in October 2008. (*Id.* at 27-28.)  Finally, without describing its origin or purpose, she refers to an "alleged score sheet" that "contains false entries with respect to Plaintiff."  (*Id.* at 28).

The court notes that employees may bring Title VII retaliation claims for employer retaliation post-employment, such as spreading derogatory rumors about the employee or giving the employee a negative employment reference.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997); Abdullahi *v. Prada USA Corp.*, 520 F.3d 710, 713 (7th Cir. 2008).  Plaintiff's allegations of post-employment retaliation, however, are completely insufficient.  Even drawing all reasonable inferences in favor of Plaintiff, the wrongdoing is in many instances de minimis.  In other instances, she has offered no explanation for how she was harmed.  More importantly, the allegations are simply too sketchy.  There is no basis for concluding that all—or any—of the actors knew of her EEOC charge or had a motive to retaliate against her because of it.  The allegation that Plaintiff "believes" Defendants are parties to some false allegation based on a telephone conversation she claims to have overheard is pure speculation.  Furthermore, Plaintiff's allegation that several of the Defendants retaliated against her by providing false testimony cannot serve as the basis for a retaliation claim because such communications are privileged under federal law.  *See Briscoe v.*

*LaHue*, 663 F.2d 713, 720-21 (7th Cir. 1981). Therefore, Plaintiff's post-employment retaliation claims are dismissed with prejudice.

### E.    Plaintiff's ADA Claim

Plaintiff claims she was the victim of discrimination on the basis of her disability, as well. To state a claim under the Americans with Disabilities Act, a plaintiff must first establish that she suffers from a disability within the meaning of the Act. *See Duncan v. State of Wisc. Dept. of Health and Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1999) (noting that "[t]he first hurdle a plaintiff must pass . . . is the requirement that the plaintiff must be 'disabled'"). The ADA defines a disability as either "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual or "a record of such impairment." 42 U.S.C. § 12102(1)(A)–(B). "Not every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." however. *Cassimy v. Bd. of Educ. of Rockford Pub. Schs., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006). In assessing whether an impairment is substantially limiting, courts consider the nature and severity of the impairment, its duration or expected duration, and its permanent or long-term impact or its expected impact. *See Serednyi v. Beverly,* ___ F.3d ___, 2011 WL 3800123, at *11 (7th Cir. 2011) (citing 29 C.F.R. § 1630.2(j)(2)).

Plaintiff here claims that she is disabled, within the meaning of ADA by her history of short-term pneumonia and breast cancer. (Pl.'s Rep. to City's Mot. to Dismiss at 24.) Plaintiff's short-term pneumonia resulted in her going on medical leave from March 12, 2007, to May 6, 2007. (Compl. ¶ 21.) In suggesting that the condition was severe, Plaintiff notes that certain medical scans noted "some possible irregularities" and that she informed Chief Brown that "she might go to the Mayo Clinic for further evaluation." (Pl.'s Rep. to City's Mot. to Dismiss at 24.) Plaintiff has not alleged that the pneumonia was anything more than a temporary condition, however, nor does she suggest that, after her return to work, it affected her employment in any way. As such, she has not alleged that she had a "disability" under the parameters of the ADA. *See e.g., Rinehimer v. Cemcolift, Inc.*,

292 F.3d 375, 381 (3d. Cir. 2002) (pneumonia is a temporary condition and is not protected by the ADA). Plaintiff's status as a two-time breast cancer survivor fails to qualify as a "disability" for similar reasons. This fact is alleged by Plaintiff solely in passing and, in doing so, Plaintiff does not in any way suggest that her past battles with this disease limited her current work performance in any way, much less "substantially."[15] Indeed, she has not even alleged that Defendants were aware of this condition. Her ADA claim is dismissed.

## CONCLUSION

Defendant IRMA's motion to dismiss [128] is granted. Defendant Pate's motion to dismiss [126] is granted. The Country Club Hills Defendants' motion to dismiss [136] is granted in part and denied in part. Plaintiff's claims of disparate treatment and retaliation claim under Title VII and the ADEA survive this ruling. Her remaining claims are dismissed.

ENTER:

Dated: September 30, 2011

REBECCA R. PALLMEYER
United States District Judge

---

[15] This court recognizes that, under the ADA Amendments Act of 2008 ("ADAAA"), Plaintiff would in fact be considered disabled on account of her status as a two-time breast cancer survivor, as the ADAAA clearly provides that "an impairment that is episodic or *in remission* is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12104(4)(D) (emphasis added). However, the Seventh Circuit has recognized that these changes to the ADA were not intended to apply retroactively, so the court addresses the law in place at the time of the alleged discrimination. *See Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009). The ADAAA took effect on January 1, 2009, following the events alleged in Plaintiff's complaint. *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553.